**UNITED STATES BANKRUPTCY COURT**          <u>**FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

In re                                                                            Chapter 11

ARCAPITA BANK B.S.C.(c), *et al.*                        Case No. 12-11076 (SHL)

                           Reorganized Debtors.          (Jointly Administered)
-----------------------------------------------------------------x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA BANK B.S.C.(c),
*et al.*,

                             Plaintiff,
               vs.
                                              Adv. No. 13-01434 (SHL)
BAHRAIN ISLAMIC BANK,

                            Defendant.
-----------------------------------------------------------------x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA BANK B.S.C.(c),
*et al.*,

                             Plaintiff,
               vs.
                                              Adv. No. 13-01435 (SHL)
TADHAMON CAPITAL B.S.C.,

                            Defendant.
-----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

A P P E A R A N C E S:

MILBANK, TWEED, HADLEY & McCLOY LLP
*Counsel for Official Committee of Unsecured Creditors*
*of Arcapita Bank B.S.C.(c), et al.*
  By:  Dennis F. Dunne, Esq.
        Evan R. Fleck, Esq.
1 Chase Manhattan Plaza
New York, New York 10005
     -and-

By:  Andrew M. Leblanc, Esq.
1850 K Street, NW, Suite 1100
Washington, D.C. 20006

K&L GATES LLP
*Counsel for Bahrain Islamic Bank and Tadhamon Capital B.S.C.*
By:  John A. Bicks, Esq.
      Lani A. Adler, Esq.
599 Lexington Avenue
New York, New York 10022

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are motions to dismiss filed by Bahrain Islamic Bank ("BisB") and

Tadhamon Capital B.S.C. ("Tadhamon," and together with BisB, the "Defendants"),

respectively, in the above-captioned adversary proceedings.  The adversary proceedings were

brought by the official committee of unsecured creditors for the above-captioned chapter 11

cases (the "Committee").  The cases seek the turnover of funds invested by the Debtor Arcapita

Bank—a Bahraini investment bank—with the Defendants—two Bahraini entities—just before

the bankruptcy filing.  Because the motions in the two cases raise the same issues, the Court will

address them together.  The Defendants make several arguments for dismissal, including that the

Court lacks personal jurisdiction over the Defendants.  For the reasons set forth below, the

motions are granted for lack of personal jurisdiction.

## BACKGROUND

Arcapita Bank B.S.C.(c) ("Arcapita"), one of the above-captioned reorganized debtors, is

licensed as an Islamic wholesale bank by the Central Bank of Bahrain.  BisB Compl. ¶ 12;

Tadhamon Compl. ¶ 12.  Headquartered in Bahrain, Arcapita is operated as an investment bank

and is a global manager of Shari'ah compliant alternative investments.  BisB Compl. ¶ 12;

Tadhamon Compl. ¶ 12.  Prior to its bankruptcy filing, Arcapita and its affiliates employed 268

people and, together with the debtors and their non-debtor subsidiaries, maintained offices in

Bahrain, Atlanta, London, Hong Kong and Singapore.  BisB Compl. ¶ 12; Tadhamon Compl. ¶

12.

 Defendant BisB is an Islamic commercial bank headquartered in Bahrain.  BisB Compl. ¶

13.  BisB maintains correspondent bank accounts in the United States with Deutsche Bank,

Standard Chartered Bank and JP Morgan Chase Bank.  BisB Compl. ¶ 14.  As required by the

Patriot Act, BisB has designated an agent for service of process in the United States in

connection with these accounts.  BisB Compl. ¶14.  BisB also participates in the Clearing House

Interbank Payments System, located in New York.  BisB Compl. ¶14.

 Defendant Tadhamon is a Bahraini corporation and a subsidiary of Tadhamon

International Islamic Bank ("TIIB"), a Yemeni bank that offers Islamic banking and investment

services to customers in Yemen and abroad.  Tadhamon Compl. ¶ 13.  Tadhamon serves as the

investment arm of TIIB.  Tadhamon Compl. ¶ 13.  While Tadhamon does not maintain any

correspondent accounts in the United States, *see* Hr'g Tr. 62:19-21 (March 19, 2014), TIIB has

correspondent bank accounts in the United States with Mashreq Bank and the Bank of New York

Mellon.  Tadhamon Compl. ¶14.  As required by the Patriot Act, TIIB has designated an agent

for service of process in the United States in connection with each of these accounts and also

participates in the Clearing House Interbank Payments System in New York.  Tadhamon Compl.

¶14.

 According to the Defendants, they do not and have never maintained offices, staff or

telephone numbers in the United States.  Decl. of Waleed Rashdan ¶ 2 [Tadhamon ECF No. 8];

Decl. of Mohammed Ebraim Mohammed ¶ 2 [BisB ECF No. 8].  The Defendants maintain that

they do not do business in the United States, do not solicit business or clients in the United States

and do not advertise in the United States.  Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2.  Neither

Defendant has filed a proof of claim in the debtors' cases.

### A.  The Placements

A few days prior to its bankruptcy filing, Arcapita made several discrete short-term debt

investments through the Defendants (the "Placements").  BisB Compl. ¶¶ 27, 30; Tadhamon

Compl. ¶¶ 27, 31.  The Placements were made under two separate investment agreements

between Arcapita and each of the Defendants (the "Placement Agreements").  *Id*.[1]  Both of the

Placement Agreements were negotiated and signed in Bahrain and provided that the laws of the

Kingdom of Bahrain govern, except to the extent that such laws conflicted with the principles of

Islamic Shari'ah, in which case Shari'ah law would prevail.   Rashdan Decl. ¶ 13 & Ex. A, § 7.1;

Mohammed Decl. ¶ 5 & Ex. A § 12.

Under the terms of the Placement Agreements, Arcapita appointed the Defendants to

serve as its agent in the purchase of the Placement investments on Arcapita's behalf.  BisB

Compl. ¶¶ 23-24; Tadhamon Compl. ¶¶ 22, 24.  The Defendants were subsequently obligated to

repurchase the Placements from Arcapita on a deferred payment basis for an amount equal to the

original investment, plus an agreed-upon return (the "Placement Proceeds").  BisB Compl. ¶¶ 2,

24; Tadhamon Compl. ¶ 2, 24.  The Defendants were to transfer the Placement Proceeds to

---

[1]        Arcapita and BisB entered into their Placement Agreement on July 10, 2003.  BisB Compl. ¶ 23.  Arcapita
made at least five previous investments with BisB under the terms of the Placement Agreement in the two years
before the investments here were made.  BisB Compl. ¶ 26.  These previous transfers are not relied on by the
Committee as a basis for personal jurisdiction.  Indeed, the Committee states that "Arcapita did not enter into
placement transactions with [BisB] as part of the ordinary course of business."  BisB Compl. ¶ 25.  Accordingly, the
Court does not address these previous transfers as part of its jurisdictional analysis.

        Arcapita and Tadhamon entered into their Placement Agreement on March 15, 2012.  Tadhamon Compl. ¶¶
22-23.  The Committee does not allege that Arcapita had placed any investments with Tadhamon prior to the
transactions in question.  Tadhamon Compl. ¶¶ 22-23.

Arcapita on the designated maturity date of the Placement.  BisB Compl. ¶¶ 2, 24; Tadhamon

Compl. ¶ 2, 24.

Consistent with these Placement Agreements, Arcapita entered into a Placement with

BisB in the amount of $10 million on March 14, 2012 (the "BisB Placement").  BisB Compl. ¶

27.  To execute the BisB Placement, Arcapita transferred funds from its account at JP Morgan

Chase Bank in New York to the correspondent bank account maintained by BisB at JP Morgan

Chase Bank in New York.  BisB Compl. ¶ 15.  The Committee alleges that this transfer took

place at the direction of BisB.  BisB Compl. ¶¶ 15, 28.  On the same day as the transfer, BisB

purchased the commodities for Arcapita through a London broker.  Mohammed Decl. ¶ 10.

Arcapita entered into two Placements with Tadhamon on March 15, 2012, each for $10

million (the "Tadhamon Placements").  Tadhamon Compl. ¶ 27.  To execute the Tadhamon

Placements, Arcapita transferred funds from its account at JP Morgan Chase Bank in New York

to an account at HSBC Bank in New York.  Tadhamon Compl. ¶ 28.  The HSBC account was a

correspondent bank account maintained by Khaleeji Commercial Bank B.S.C., Tadhamon's bank

in Bahrain.  Rashdan Decl. ¶ 7.  The funds were then immediately transferred from the HSBC

account to an account held by Tadhamon at Khaleeji Commercial Bank in Bahrain.  Tadhamon

Compl. ¶ 28; Rashdan Decl. ¶ 7.  The Committee asserts that the HSBC account was designated

by Tadhamon as the account to which the funds were to be transferred.  Tadhamon Compl. ¶ 28.

### B.  Bankruptcy Case

Less than a month after these Placements, Arcapita filed for protection under Chapter 11

of the Bankruptcy Code.  On April 5, 2012, the U.S. Trustee appointed an official committee of

unsecured creditors pursuant to Section 1102(a) of the Bankruptcy Code (the "Committee" or the

"Plaintiff") .  All of the Placements matured within a month after Arcapita's bankruptcy filing.[2]

Both Defendants, however, failed to deliver the Placement Proceeds to Arcapita.  BisB Compl.

¶¶ 32, 34; Tadhamon Compl. ¶¶ 35, 38.  Instead, the Defendants informed Arcapita that, under

Bahraini law, they were setting off the Placement Proceeds against amounts owed to them by

Arcapita.  BisB Compl. ¶ 34; Tadhamon Compl. ¶ 38.[3]  In December 2012, Tadhamon returned

to Arcapita the portion of the Placement Proceeds that exceeded its purported setoff.  Tadhamon

Compl. ¶40.  The Committee alleges that the current outstanding balance of Placement Proceeds

due and owing to Arcapita is $10,002,292.00 from BisB and $18,480,269.00 from Tadhamon.

BisB Compl. ¶ 36; Tadhamon Compl. ¶ 40.

In June 2013, the Court confirmed the proposed plan of reorganization in Arcapita's

bankruptcy.  *See Findings of Fact, Conclusions of Law, and Order Confirming the Second*

*Amended Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors With*

*Respect to Each Debtor Other Than Falcon Gas Storage Company, Inc. Under Chapter 11 of the*

*Bankruptcy Code* [ECF No. 1262].  Later that summer, the Court entered the *Order Granting*

*Committee's Motion for Leave, Standing and Authority to Prosecute Avoidance Claims* [ECF

No. 1411], which granted the Committee the authority to pursue the claims asserted here against

the Defendants.  The Committee subsequently brought these cases against the Defendants for

breach of contract, turnover, the avoidance of a preferential transfer, violation of the automatic

---

[2]       The BisB Placement matured on March 29, 2012, and the Tadhamon Placements matured on March 30,
2012 and April 16, 2012, respectively.  BisB Compl. ¶ 31; Tadhamon Compl. ¶ 27.  On March 28, 2012 and April
15, 2012, respectively, Arcapita and Tadhamon reinvested the Tadhamon Placements for an additional term,
resulting in new maturity dates of April 30, 2012 and May 16, 2012.  Tadhamon Compl. ¶ 36.

[3]       Based on Arcapita's pre-existing relationship with the Defendants, Arcapita already owed millions in
unmatured debt to each of the Defendants at the time of the Placements.  Arcapita owed $9,774,096.15 to BisB as a
result of investments that BisB made with Arcapita on December 1, 2011.  BisB Compl. ¶¶ 3, 16-20.  Arcapita owed
$18,497,734.48 to Tadhamon as a result of multiple investments that Tadhamon made with Arcapita between
September 2009 and January 2012.  Tadhamon Compl. ¶¶ 17-19.

stay, and claims disallowance.  BisB Compl. ¶ 1; Tadhamon Compl. ¶ 1.  The Committee seeks,

among other things, to compel the Defendants to comply with their obligations under the

Placement Agreements by turning over the Placement Proceeds.  Alternatively, the Committee

seeks to have the Placements avoided and recover the funds as an improper payment of

antecedent debts under Sections 547(b) and 550 of the Bankruptcy Code.  BisB Compl. ¶ 6;

Tadhamon Compl. ¶ 6.

## DISCUSSION

### A.  The Doctrine of Personal Jurisdiction

Fed. R. Civ. P. 12(b)(2), incorporated herein by Bankruptcy Rule 7012(b), provides for

dismissal of a case for lack of personal jurisdiction.  *See* Fed. R. Bankr. P. 7012(b).  To survive a

Rule 12(b)(2) motion, a party must make a prima facie showing that jurisdiction exists.  *See*

*O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 659, 673

(2d Cir. 2013) (citing *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)).

This "must include an averment of facts that, if credited by the ultimate trier of fact, would

suffice to establish jurisdiction over the defendant."  *In re Terrorist Attacks*, 714 F.3d at 673

(quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).   "[A]

court may consider materials outside the pleadings, but must credit plaintiffs' averments of

jurisdictional facts as true."  *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556,

566-67 (S.D.N.Y. 2012).

In a Rule 12(b)(2) motion, all pleadings and affidavits are to be construed in a light most

favorable to the plaintiff and all doubts resolved in the plaintiff's favor.  *See In re Terrorist*

*Attacks*, 714 F.3d at 673 (citing *Penguin Grp.*, 609 F.3d at 34).  This is "notwithstanding a

controverting presentation by the moving party."  *In re Stillwater Capital*, 851 F. Supp. 2d at 567

(quoting *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993)).  But where a "defendant rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction — and plaintiffs do not counter that evidence — the allegation may be deemed refuted." *In re Stillwater Capital*, 851 F. Supp. 2d at 567 (quoting *Schenker v. Assicurazioni Generali S.p.A., Consol.*, 2002 U.S. Dist. LEXIS 12845, at *12 (S.D.N.Y. July 15, 2002)).  Furthermore, "in determining whether a plaintiff has met [its] burden, [a court] will not draw argumentative inferences in the plaintiff's favor . . . nor must [it] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673.

A court must conduct a two-part inquiry to determine whether personal jurisdiction exists over a defendant.  First, the court needs to examine whether the defendant has "the requisite minimum contacts with the United States at large." *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010) (citing *Cruisephone, Inc. v. Cruise Ships Catering & Servs., N.V. (In re Cruisephone, Inc.)*, 278 B.R. 325, 331 (Bankr. E.D.N.Y. 2002)).  If such contacts are found to exist, the court must then determine the reasonableness of exercising personal jurisdiction over the defendant under the circumstances and whether doing so would "offend 'traditional notions of fair play and substantial justice.'" *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (quoting *Asahi Metal Indus. Co., Ltd. v. Super. Ct. Cal.*, 480 U.S. 102, 113 (1987) (internal quotations omitted); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996)); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) ("Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant

must present a compelling case that the present of some other considerations would render

jurisdiction unreasonable.") (internal quotations omitted).

When examining the first question of "minimum contacts," courts differentiate between

"specific" and "general" personal jurisdiction.   *See In re Terrorist Attacks*, 714 F.3d at 673.

Either is adequate to satisfy the minimum contacts requirement of the Due Process Clause. *See*

*id*. at 674 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16

(1984)).  Specific jurisdiction is established when a foreign defendant "'purposefully direct[s] his

activities at residents of the forum' and . . . the underlying cause of action 'arise[s] out of or

relate[s] to those activities.'"  *Madoff*, 460 B.R. at 117 (quoting *Burger King Corp. v. Rudzewicz*,

471 U.S. 462, 472 (1985)); *see also Bank Brussels Lambert*, 305 F.3d at 127 ("Where the claim

arises out of, or relates to, the defendant's contacts with the forum—i.e., specific jurisdiction—

minimum contacts exist where the defendant 'purposefully availed' itself of the privilege of

doing business in the forum and could foresee being 'haled into court' there.") (internal citations

and quotations omitted).

In contrast, general jurisdiction "is based on the defendant's general business contacts

with the forum . . . and permits a court to exercise its power in a case where the subject matter of

the suit is unrelated to those contacts."  *In re Terrorist Attacks*, 714 F.3d at 674 (quoting *Metro.*

*Life Ins. Co.*, 84 F.3d at 568; *Helicopteros*, 466 U.S. at 414-16 & nn.8-9).  Since "general

jurisdiction is not related to the events giving rise to the suit, . . . courts impose a more stringent

minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and

systematic general business contacts.'"  *In re Terrorist Attacks*, 714 F.3d at 674 (quoting

*Helicopteros*, 466 U.S. at 416 & n. 9).

If minimum contacts are present, a court must then turn to the second question of whether the exercise of jurisdiction will "offend 'traditional notions of fair play and substantial justice.'" *Madoff Inv. Sec.*, 460 B.R. at 117 (quoting *Asahi Metal Indus.*, 480 U.S. at 113; *Metro. Life Ins. Co.*, 84 F.3d at 567).  In determining whether the assertion of jurisdiction is reasonable in a given case, courts will consider the following factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  *Bank Brussels Lambert*, 305 F.3d at 129 (internal citations and quotations omitted).

### B.  <u>No Specific Jurisdiction Exists Over the Defendants</u>

As to the first prong of the jurisdictional inquiry, the Defendants argue that their actions do not represent the necessary minimum contacts to comport with due process.  They argue that because the transactions here took place between foreign entities under agreements negotiated, signed and performed in a foreign country and that the one-time use of correspondent accounts in New York to receive funds from Arcapita was not significant enough to impart jurisdiction.  The Committee counters that the Defendants purposefully availed themselves of the benefits of the U.S. banking system by using New York correspondent accounts and that the Committee's underlying claims arise from or relate to the use of those accounts.[4]

Central to the Committee's jurisdictional arguments is the use of correspondent bank accounts, which are

---

[4]     The Committee states that it currently lacks the information necessary to determine whether the Defendants are subject to general jurisdiction, but reserves its right to assert such jurisdiction pending discovery.  BisB Obj. 8 n.6; Tadhamon Obj. 8 n.6.  The only question before the Court, therefore, is whether specific jurisdiction exists over the Defendants.

> accounts in domestic banks held in the name of foreign financial institutions.
> Typically, foreign banks are unable to maintain branch offices in the United
> States and therefore maintain an account at a United States bank to effect dollar
> transactions. . . . Without correspondent banking . . . it would often be impossible
> for banks to provide comprehensive nationwide and international banking
> services—among them, the vital capability to transfer money by wire with
> amazing speed and accuracy across international boundaries.

*Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 (2d Cir. 2012) (internal citations and

quotations omitted).  The mere existence of a correspondent account by itself is insufficient to

establish minimum contacts over a foreign bank.  *See Tamam*, 677 F. Supp. 2d at 727 (in the

context of discussion on CPLR § 302(a)(1), stating that "courts in this district have routinely held

that merely maintaining a New York correspondent bank account is insufficient to subject a

foreign bank to personal jurisdiction.")[5] (collecting cases); *Licci v. Lebanese Canadian Bank,

SAL*, 20 N.Y.3d 327, 336-38 (2012).[6]  Rather, the issue is whether the Defendants' *use* of a

correspondent account in these cases conveys specific jurisdiction upon them.

We begin with Tadhamon.  Arcapita transferred the Tadhamon Placement funds to a

correspondent bank account at HSBC Bank in New York that was maintained by Khaleeji

Commercial Bank, which is Tadhamon's Bank in Bahrain.  Tadhamon Compl. ¶28; Rashdan

---

[5]      Many of the cases cited by the parties and discussed in this decision involve personal jurisdiction under the
New York long-arm statute – specifically the first prong of CPLR 302(a)(1) – which states that "a court may
exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any
business within the state or contracts anywhere to supply goods or services in the state. . . ." NY CPLR § 302(a)(1).
The Second Circuit has stated that "despite the fact that [S]ection 302(a)(1) of New York's long-arm statute and
constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute
may theoretically be prohibited under due process analysis, we would expect such cases to be rare."  *Licci v.
Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013).  It is not surprising, therefore, that the parties rely
on such cases in their pleadings.

[6]      In connection with their maintenance of correspondent accounts in the United States, BisB and TIIB
(Tadhamon's parent) have designated agents for service of process in the United States as required under the Patriot
Act and participate in the Clearing House Interbank Payments System in New York.  Tadhamon Compl. ¶ 14; BisB
Compl. ¶ 14.  But courts have held that such actions do not constitute the necessary minimum contacts to satisfy due
process.  "If these PATRIOT Act certifications were sufficient minimum contacts to satisfy due process, every
foreign bank that opens a correspondent account in the United States would be subject to jurisdiction.  Clearly, that
is not the case.  Moreover, the fact that these PATRIOT Act certifications require foreign banks to designate a proxy
to accept service of process by the U.S. Government does not indicate that Defendants should reasonably foresee
being haled into a U.S. court . . . ."  *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 732 (S.D.N.Y. 2010).

Decl. ¶ 7.  The funds were then transferred from the HSBC account to an account held by

Tadhamon at Khaleeji in Bahrain.  Tadhamon Compl. ¶ 28.  It did not even maintain its own

correspondent account, but instead used an account maintained in the United States by another

bank.  But Tadhamon's use of a third party's correspondent bank account is insufficient to

establish specific jurisdiction.  Minimum contacts will be found "where the defendant

purposefully availed itself of the privilege of doing business in the forum and could foresee

being haled into court there."  *Bank Brussels Lambert*, 305 F.3d at 127 (internal citations and

quotations omitted).  Tadhamon made a conscious decision to forego maintenance of a

correspondent account in the United States and has clearly not benefitted from the privilege of

doing business here under these circumstances.  If anything, Tadhamon has accepted the

inconvenience caused by its lack of a correspondent account in the United States, and therefore

arranged an alternate means of payment through a third party when transacting business in US

currency.  Thus, Tadhamon has not directed its activities towards residents of this forum in a way

that supports personal jurisdiction.  *See Madoff*, 460 B.R. at 117.[7]

Unlike Tadhamon, the BisB Placement funds were transferred to BisB's own

correspondent bank account at JP Morgan Chase Bank in New York.  BisB Compl. ¶ 15.[8]  This

one-time use of BisB's own correspondent bank account is a closer call than Tadhamon.  But it

too ultimately falls short given all the other facts here.  The use of this correspondent bank

account was neither the beginning nor the end of the Placement, but rather a transitory

intermediate step.  The transaction began with the negotiation and signing of the contract in

---

[7]      Even if one views Khaleeji as Tadhamon's agent, the use of this correspondent bank account does not
provide a basis for personal jurisdiction for the same reasons discussed below as to BisB.

[8]      BisB maintains correspondent bank accounts in the United States at Deutsche Bank, Standard Chartered
Bank and JP Morgan Chase Bank.  BisB Compl. ¶ 14.

Bahrain between Bahraini parties.  It ended with the funds being transferred out of the country

the same day for investment.  So while the use of the account is admittedly a contact, it is too

weak to satisfy due process requirements.  *See Burger King*, 471 U.S. at 475 ("[P]urposeful

availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a

result of *random, fortuitous, or attenuated contacts*.") (internal citations and quotations omitted)

(emphasis added).

The Committee raises several arguments in support of jurisdiction, but none are

persuasive.  The Committee first argues that the Defendants took sufficient affirmative steps by

designating the correspondent accounts where Arcapita should transfer funds.  BisB Compl. ¶

28; Tadhamon Compl. ¶ 28.  The Committee reasons that these actions amount to purposeful

availment of the United States banking system.  But this argument is undermined by the fact that

it was Arcapita that actually transferred the funds to the correspondent accounts.  BisB Compl. ¶

28 ("To execute the Placement, Arcapita, at BIB's direction, transferred $10 million in funds

from its account at JP Morgan Chase Bank in New York to BIB's account at JP Morgan Chase

Bank in New York."); Tadhamon Compl. ¶ 28 ("To execute the Placements, Arcapita transferred

a total of $20 million in funds from its account at JP Morgan Chase Bank in New York to an

account designated by Tadhamon at HSBC Bank in New York.")  As noted by the Supreme

Court,

> '[t]he unilateral activity of those who claim some relationship with a nonresident
> defendant cannot satisfy the requirement of contact with the forum State.  The
> application of that rule will vary with the quality and nature of the defendant's
> activity, but it is essential in each case that there be some act by which the
> defendant purposefully avails itself of the privilege of conducting activities within
> the forum State, thus invoking the benefits and protections of its laws.'

*Burger King*, 471 U.S. at 474-75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  In any

event, the mere knowing receipt of funds at a correspondent bank account is insufficient to

establish jurisdiction.  *See, e.g., Rushaid v. Pictet & Cie*, 2014 N.Y. Misc. LEXIS 3888, at *8

(N.Y. Sup. Ct. Aug. 26, 2014) ("While plaintiffs submitted documents showing that defendants

knew of the third-party monetary transfers from a New York correspondent account for the

benefit of the Pictet accounts, this alone does not constitute purposeful conduct.  This passive

receipt of funds do not constitute 'volitional acts' by defendants and, as such, defendants did not

avail themselves of the privilege of conduction activities within the forum State, and thereby

neglect to invoke the benefits and protections of its laws.") (internal citations and quotations

omitted); *Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 159 (1st Dept. 2010) ("[T]he

mere payment into a New York account does not alone provide a basis for New York

jurisdiction, especially when all aspects of the transaction occur out of state, absent more

extensive New York banking relating to the transaction at issue.") (internal citations and

quotations omitted).

    The Committee further argues that the Defendants instructed Arcapita to transfer the

funds to the correspondent accounts, providing Arcapita with the Swift codes[9] necessary to

effectuate the transfer.  *See* Rashdan Decl., Exs. B & C; Decl. of Nicholas A. Bassett, Exs. D &

E [BisB ECF No. 15].  But such acts are not a substantial connection sufficient for jurisdiction.

As the Supreme Court has counseled, specific jurisdiction is appropriate only

> where the contacts proximately result from actions by the defendant himself that
> create a 'substantial connection' with the forum State.  *Thus where the defendant
> 'deliberately' has engaged in significant activities within a State . . . or has
> created 'continuing obligations' between himself and residents of the forum*, he
> manifestly has availed himself of the privilege of conducting business there, and

---

[9]    A SWIFT Code "[w]ithin the context of international payment transactions, is a code issued by the Society
for Worldwide Interbank Financial Telecommunications (SWIFT) that enables banks worldwide to be identified
without the need to specify an address or bank number.  SWIFT codes are used mainly for automatic payment
transactions."  Khwaja Masoom, *The Entrepreneur's Dictionary of Business and Financial Terms* 525 (2013); *see
also* Cambridge Dictionaries Online (April 15, 2015, 2:44 p.m.),
http://dictionary.cambridge.org/us/dictionary/business-english/swift-code (defining SWIFT Code as "the number
used by a particular financial organization for sending and receiving payments on the SWIFT system.")

> because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King*, 471 U.S. at 475-76 (internal citations and quotations omitted) (emphasis added). The Defendants' instructions to Arcapita to transfer the funds to a correspondent account held by a third party are the type of "attenuated" acts that do not qualify as the basis for specific jurisdiction. *Burger King*, 471 U.S. at 475. Without more, the Court finds that the Defendants use of this account is not a strong enough action on which to rest personal jurisdiction.[10]

And despite the use of the correspondent bank accounts, neither Defendant would have reasonably foreseen being haled into court in the United States. Neither maintains a presence in the United States. The Defendants do not and have never maintained offices, staff or telephone numbers in the United States. Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2. They do not do business in the United States, do not solicit business or clients in the United States and do not advertise in the United States. Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2. Indeed, these Placement Agreements were executed in Bahrain and provide that they are governed by the laws of Bahrain. Rashdan Decl. ¶ 5 & Ex. A, § 7.1; Mohammed Decl. ¶ 7 & Ex. A, § 12. Given all these facts, the Defendants would reasonably assume that any suit relating to the Placement Agreements would be in Bahrain under Bahraini law. *Cf. Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) ("The Second Circuit has indicated that entering into a contract with a New York choice of law clause is 'a significant factor in a personal jurisdiction analysis because the parties . . . invoke the benefits and protections of New York law.") (quoting *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 22-23

---

[10]    The Defendants claim that the correspondent accounts were used to accommodate Arcapita's desire to transfer the funds in U.S. dollars, but there is no evidence of this in the record. *See* Tadhamon Reply at 1-2; Hr'g Tr. 62:8-16 (March 19, 2014). The Court does not need to reach that issue for purposes of this decision.

(2d Cir. 2004); *AIG Fin. Prod. Corp. v. Public Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 673 F. Supp. 2d 354, 364 (S.D.N.Y. 2009)); *see also Budget Blinds, Inc. v. White*, 536 F.3d 244, 261 (3d Cir. 2008) ("[A] choice-of-law provision 'standing alone would be insufficient to confer jurisdiction,' but combined with other facts, it may reinforce a party's 'deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'") (quoting *Burger King*, 471 U.S. at 482); *Atlantic Fin. Fed. v. Bruno*, 698 F. Supp. 568, 573 (E.D. Pa. 1988) ("A choice of law provision is only a factor to show whether defendants could reasonably foresee that their acts would have effect in Pennsylvania; it does not itself vest jurisdiction.").[11]

The Committee relies most heavily on three cases, but all of them are distinguishable. While courts in each of the three cases found personal jurisdiction based on the use of an account, the cases all involved a greater quality of contact with the United States than are present here. The first of these cases, *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327 (2012), involved the use of a correspondent bank account to make dozens of international transfers. In the case, plaintiffs from the United States, Canada and Israel brought suit against Lebanese Canadian Bank ("LCB") for injuries sustained in rocket attacks by Hisballah. *Id.* at 330. The plaintiffs alleged that LCB had assisted Hizballah in committing the attacks by facilitating international monetary transactions through the Shahid Foundation, an entity that had been identified as the "financial arm" of Hizballah. *Id.* at 331. LCB's sole point of contact with the United States was a correspondent bank account that it maintained with American Express Bank in New York. *Id.* at 332. The plaintiffs alleged, in part, that LCB had used this account to make dozens of international wire transfers on behalf of Shahid. *See id.* Concluding that the case

---

[11] The Tadhamon Placement Agreement even provides that the parties submit to the jurisdiction of the Bahraini courts for any proceedings arising from or in connection with the contract. Rashdan Decl. Ex. A, § 7.2.

presented issues not previously addressed by New York state courts, the Second Circuit certified

questions to the New York Court of Appeals as to whether a foreign bank's maintenance and use

of a correspondent bank account at a New York financial institution established personal

jurisdiction under the New York long-arm statute. *See Licci v. Lebanese Canadian Bank, SAL*,

673 F.3d 50, 62-63, 66, 74 (2d Cir. 2012).

In answering these certified questions, the New York Court of Appeals noted that a court

must "closely examine the defendant's contacts for their quality," noting that in other cases, a

focus on the nature and extent of a defendant's involvement in the deposit of funds in a

correspondent account was "essentially adventitious." *Licci*, 20 N.Y.3d at 338.  The court stated

that such an analysis "may be complicated by the nature of inter-bank activity, especially given

the widespread use of correspondent accounts nominally in New York to facilitate the flow of

money worldwide, often for transactions that otherwise have no other connection to New York,

or indeed the United States." *Id.*  Ultimately, the court found that "a foreign bank's repeated use

of a correspondent account in New York on behalf of a client – in effect, a 'course of dealing' –

show[s] purposeful availment of New York's dependable and transparent banking system, the

dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of

New York and the United States." *Id*. at 339.  The New York Court of Appeals then found that

the plaintiffs' claims arose from the bank's transaction of business in New York because LCB's

use of a "New York account 'dozens' of times indicate[d] desirability and a lack of coincidence."

*Id*. at 340.

After receiving this guidance from the New York Court of Appeals, the Second Circuit

addressed whether the exercise of personal jurisdiction over LCB was consistent with

constitutional due process.  The Second Circuit focused on the connection between the wire

transfers and the alleged unlawful conduct, noting that the transfers were "a part of the principal wrong at which the plaintiffs' lawsuit is directed." *Licci*, 732 F.3d at 170. While reiterating that the "mere maintenance" of a correspondent account was not enough to support personal jurisdiction, the Second Circuit stated that

> in connection with this particular jurisdictional controversy – a lawsuit seeking redress for the allegedly unlawful provision of banking services for which the wire transfers are a part – allegations of LCB's repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of Sahid, in order to further Hisballah's terrorist goals, are sufficient.

*Id.* at 171. Like the New York Court of Appeals, the Second Circuit focused on the fact that the transfers in *Licci* were recurring, stating that "the plaintiffs allege wire transfers through AmEx that numbered in the dozens and totaled several million dollars, so it cannot be said that LCB's contacts with New York were 'random, isolated, or fortuitous.'" *Id.* The Second Circuit ultimately found that "the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes 'purposeful availment of the privilege of doing business in New York,' . . . so as to permit the subjecting of LCB to specific jurisdiction within the Southern District of New York consistent with due process requirements." *Id.* at 170-71 (quoting *Bank Brussels Lambert*, 305 F.3d at 127). Unlike the Defendants' conduct here, therefore, the defendant in *Licci* repeatedly used a correspondent account which was integrally related to the unlawful conduct at issue in the lawsuit.

The Committee's second case fails for similar reasons. In *Dale v. Banque SCS Alliance S.A.*, 2005 U.S. Dist. LEXIS 20967 (S.D.N.Y. September 22, 2005), the court was confronted with allegations of RICO violations against a Swiss corporation. The plaintiff insurance companies alleged that the defendant had assisted a third party in defrauding them. The illegally

obtained funds were laundered through a series of fraudulent wire transfers to and from the

defendant's four correspondent bank account in New York and other accounts maintained

outside of New York. The court preliminarily noted that under CPLR § 302(a)(1), "[a] single

transaction would be sufficient to fulfill this requirement, so long as the relevant cause of action

also arises from that transaction." *Id.* at *11 (quoting *Bank Brussels Lambert v. Fiddler*

*Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999)). In fact, the defendant maintained

several correspondent bank accounts in New York that were used to effect a number of the

unlawful funds transfers. *See Dale*, 2005 U.S. Dist. LEXIS 20967, at *12. The court therefore

found that the complaint stated a prima facie case for personal jurisdiction under the New York

long-arm statute, C.P.L.R. § 302(a)(1).

Finally, the Committee cites to the single use of a correspondent account to sustain

personal jurisdiction in *Correspondent Services Corp. v. J.V.W. Investments Ltd.*, 120 F. Supp.

2d 401 (S.D.N.Y. 2000). In that case, the third-party plaintiff—a Dominican corporation—

sought to recover an investment that had been transferred to the New York correspondent

account of the third-party defendant—a Bahamian bank. The defendant argued that the court did

not have personal jurisdiction under the New York long-arm statute, as it was a foreign

defendant without contacts, offices, telephone listings or personnel in New York. In analyzing

whether the third-party defendant was transacting business in the jurisdiction, the court

recognized that "even a single action within New York is sufficient to confer jurisdiction under §

302(a) *if it has a sufficient nexus with the cause of action*." *Id.* at 404 (emphasis added). In

looking at the totality of the circumstances, the court noted that the defendant acknowledged that

it held securities accounts at a New York brokerage firm which it used to "facilitate international

financial transactions for itself and for its clients, including the . . . mutual fund purchases . . .

19

requested on behalf of [the third party plaintiff] JVW." *Id.* at 404. The court found that not only did the defendant maintain an account in New York to facilitate international business transactions, but it also used the account for the purchase and delivery of the securities, with the unauthorized purchase being at the very root of the action in the case. *Id.* at 405. Thus, it concluded that "[t]he single purposeful act of transferring JVW's funds to New York constitutes the 'transaction of business' from which this cause of action *directly arises*." *Id.* at 404-05 (emphasis added). As such, the jurisdictional conclusion in *Correspondent Services* was based upon the plaintiff's fraud claim directly arising from the defendant's unauthorized purchase of the stock in the context of the defendant's general use of its New York accounts for itself and various clients. By contrast, the money here passed through these correspondent bank accounts once, but only as part of a transaction that began in Bahrain between Bahraini parties under a Bahraini contract and that ended overseas. *See Pramer SCA*, 907 N.Y.S.2d at 159 (mere payment into New York account insufficient where all aspects of transaction occurred out of state).

Moreover, the use of the accounts was not central to the alleged wrong. For example, the Committee has alleged causes of action for breach of contract and the turnover of assets under Sections 541, 542 and 550 and violation of the automatic stay under Section 362, all of which are based upon the alleged setoff by the Defendants and their failure to transfer the Placement Proceeds to Arcapita upon the maturity dates. Thus, the alleged unlawful action was the Defendants' subsequent refusal to return money to Arcapita; it was not the Defendants' original receipt of these transfers under the Placement Agreements, an act which no party has alleged was

improper.  Thus, the one-off use of the correspondent account by BisB is unrelated to the setoff issue, let alone central to its adjudication.[12]

## C. <u>Jurisdictional Discovery Is Not Appropriate</u>

The Committee states that it lacks sufficient information to determine whether the Defendants are subject to the general jurisdiction of this Court, but reserves the right to assert such jurisdiction pending discovery.  It initially requested discovery to find "(i) additional facts which further demonstrate that significant and numerous aspects of the Transfers involved contacts with the United States and (ii) additional contacts [the Defendant] has or has had with New York or elsewhere in the United States independent of those that are the subject matter of this lawsuit, which would subject it to the general jurisdiction of this Court."  Tadhamon Obj. at 18; *see* BisB Obj. at 17.  But the Committee offered no information to support their contention that jurisdictional discovery would yield evidence as to personal jurisdiction.  The Committee subsequently narrowed its discovery request, stating that "we should be permitted to take discovery to understand the use of correspondent bank accounts in the United States, because to the extent that it's dozens and dozens of times, the Court has no evidence before it whatsoever." Hr'g Tr. 106:1-5, March 19, 2014.  This request would be inapplicable to specific jurisdiction, due to a lack of connection with the transactions at issue in this case.

Additionally, the Committee has not shown enough to make such discovery relevant on the issue of general jurisdiction.  "At the jurisdictional stage, '. . . courts enjoy broad discretion in deciding whether to order discovery.'"  *Tymoshenko v. Firtash*, 2013 WL 1234943, at *7 (S.D.N.Y. March 27, 2013) (quoting *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.

---

[12]   The Committee also asserts a cause of action for a preferential transfer under Sections 547 and 550, and one under Section 502(d), but the use of the correspondent account is not the actionable conduct in and of itself. Rather, the use of the correspondent account only gave rise to a claim due to the debtors' bankruptcy filing, assuming that United States law would apply to the dispute regarding the holdback of funds.

2d 765, 811 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008)).  While the failure to allege a

prima facie case for jurisdiction is not necessarily a bar to jurisdictional discovery, courts have

generally been unwilling to grant additional discovery on jurisdictional issues in such

circumstances.  *See Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 609 (S.D.N.Y. 2012); *see also*

*Licci v. American Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 408 (S.D.N.Y. 2010); *Ehrenfeld v.*

*Mahfouz*, 489 F.3d 542, 550 n.6 (2d Cir. 2007); *Langenberg v. Sofair*, 2006 WL 2628348, at *5

(S.D.N.Y. Sept. 11, 2006).  In the Second Circuit, courts "have allowed jurisdictional discovery

where a plaintiff has made 'a sufficient start toward establishing personal jurisdiction.'"

*Hollenbeck v. Comeq, Inc.*, 2007 U.S. Dist. LEXIS 63547, at *8 (N.D.N.Y. Aug. 28, 2007)

(quoting *Uebler v. Boss Media*, 363 F. Supp.2d 499, 506 (E.D.N.Y. 2005)); *see also Smit v.*

*Isiklar Holding A.S.*, 354 F. Supp. 2d 260, 263 (S.D.N.Y. 2005) ("[A] court may order limited

discovery targeted at the missing jurisdictional elements, if plaintiff has shown that such an

exercise would serve to *fill any holes* in its showing.").  A party cannot base their request on

mere "'speculations or hopes . . . that further connections to [the forum] will come to light in

discovery' . . . ."  *Firtash*, 2013 WL 1234943, at *7 (quoting *Rosenberg v. PK Graphics*, 2004

WL 1057621, at *1 (S.D.N.Y. May 10, 2004)).

    The need for discovery is also undermined by the declarations supplied by the

Defendants stating that they do not and have never maintained offices, staff or telephone

numbers in the United States.  Rashdan Decl.  ¶ 2; Mohammed Decl. ¶ 2.  They state that they do

not do business in the United States, do not solicit business or clients in the United States and do

not advertise in the United States.  Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2.[13]  These additional

---

[13]    The Committee notes that these declarations do not address accounts held in the United States and the
frequency of their usage.  But the Committee cites no cases holding that use of a correspondent account is enough to
confer general jurisdiction and the case law seems to suggest the opposite.  *See In re Terrorist Attacks*, 714 F.3d at
681 (concluding that "the alleged use of correspondent bank accounts and the maintenance of a website that allows

facts before the Court only confirm that the requested jurisdictional discovery is inappropriate.

*See A.W.L.I. Group, Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 575 (E.D.N.Y.

2011) ("[J]urisdictional discovery is not permitted where, as here, the defendant submits an

affidavit that provides all the necessary facts and answers all the questions regarding

jurisdiction.")

## CONCLUSION

For the reasons stated above, the Court finds that it lacks personal jurisdiction over the

Defendants due to an absence of minimum contacts with the jurisdiction.  Accordingly, it is

unnecessary to reach the other grounds for dismissal raised by the Defendants.[14]  The Defendants

should settle an order on three days' notice.

Dated: New York, New York
      April 17, 2015

                                        */s/ Sean H. Lane*
                                        UNITED STATES BANKRUPTCY JUDGE

---

account holders to manage their accounts are insufficient to support the exercise of general personal jurisdiction"
against foreign defendants.)

[14]     Thus, the Court does not address the Defendants' arguments for dismissal based on international comity
and the presumption against extraterritorial application of United States law.  *See Ruhrgas AG v. Marathon Oil Co.*,
526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . is an essential element of the jurisdiction of a . . . court, without
which the court is powerless to proceed to an adjudication.").  But those alternative arguments for dismissal raise
serious concerns about the Committee's claims here.  *See In re Maxwell Commc'n. Corp.*, 93 F.3d 1036 (2d Cir.
1996) (discussing whether pre-petition transfers by the debtor to certain banks should be governed by United States
bankruptcy law before an American bankruptcy court or should proceed overseas and concluding that international
comity supported deferring to the courts and laws of England); *see also Sec. Investor Prot. Corp. v. Bernard L.
Madoff Inv. Sec. LLC*, 513 B.R. 222 (S.D.N.Y. 2014).